```
UNITED STATES DISTRICT COURT                          ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
AIR ITALY S.p.A.,                                  :
                                                   :
                              Plaintiff,           :       MEMORANDUM
                                                   :       AND ORDER
              - against -                          :
                                                   :       10-CV-20 (JG) (JMA)
AVIATION TECHNOLOGIES, INC. d/b/a                  :
PUBLICCHARTERS.COM, and                            :
SCANDERBEG AIR,                                    :
                                                   :
                              Defendant.           :
--------------------------------------------------------------- X
```

A P P E A R A N C E S:

    ALFORD, CLAUSEN & McDONALD, LLC
    One St. Louis Centre, Suite 5000
    Mobile, Alabama 36602
    By:    Christina May Bolin
           Lester M. Bridgeman
           D. Brian Murphy
    *Attorneys for Plaintiff*

    JOSHUA G. BLUM
    1901 Avenue of the Stars, Suite 390
    Los Angeles, California 90067
    *Attorney for Defendant Aviation Technologies, Inc.*

JOHN GLEESON, United States District Judge:

        In this breach of contract action filed by plaintiff Air Italy S.p.A. ("Air Italy"), defendant Aviation Technologies, Inc. ("Aviation") moves to disqualify Air Italy's counsel Lester Bridgeman and his law firm, Alford, Clausen & McDonald, LLC ("the Alford law firm"). Oral argument on the motion was held on January 6, 2011. For the reasons stated below, the motion is granted to the extent that Bridgemen is disqualified from serving as trial counsel on behalf of Air Italy, and is otherwise denied.

## BACKGROUND

A.  *Air Italy's Allegations*[1]

Air Italy brings this action against Aviation and Scanderbeg Air ("Scanderbeg"), stating claims for breach of contract, promissory estoppel, and fraud in the inducement. The dispute involves a series of charter flights operated by Air Italy in August and September 2009, for which Air Italy has not been fully paid. The charter flights at issue were originally planned without Air Italy's participation. In February and March 2009, Aviation and Sky King, Inc. ("Sky King")[2] sought and received approval from the United States Department of Transportation ("DOT") for the operation of a series of round-trip public charter flights between June 12, 2009 and September 13, 2009, from John F. Kennedy International Airport ("JFK Airport") to Tirana, Albania and Pristina, Kosovo. The prospectus filed with the DOT identified Sky King as the "direct air carrier" for the flights and Aviation as the "charterer."[3]

The charter program's flights were at first operated using Sky King's aircraft. However, on August 19, 2009, Sky King became unable or unwilling to continue its operations. On August 20, 2009, Aviation and Scanderbeg decided to find a substitute air carrier to perform the services Sky King would no longer provide. The defendants agreed that Aviation would take

---

[1] The facts set forth in this section are as alleged by Air Italy in its amended complaint. They do not represent findings of the Court.

[2] The original complaint filed in this action named Sky King as a defendant, in addition to Aviation and Scanderbeg. On March 24, 2010, Sky King notified the Court that it had filed for voluntary bankruptcy on March 9, 2010 in the United States Bankruptcy Court for the Eastern District of California. Also on March 24, Air Italy voluntarily dismissed Sky King. On April 21, 2010, with permission of the Court, Air Italy filed an amended complaint naming just Aviation and Scanderbeg as defendants.

Scanderbeg, which on July 6, 2010 notified the Court that it, too, had filed for voluntary bankruptcy, has not answered Air Italy's complaint or otherwise defended the action. Accordingly, the Clerk made an entry of default against Scanderbeg on June 29, 2010. On July 21, 2010, I denied a motion by Aviation to dismiss all claims against it for failure to state a claim. *Air Italy S.p.A. v. Aviation Technologies, Inc.*, No. 10-CV-20 (JG) (JMA), 2010 WL 2925949 (E.D.N.Y. July 21, 2010).

[3] Although Scanderbeg does not appear in the prospectus filed with the DOT, Air Italy alleges that Scanderbeg was the "driving force" in creating the charter program and advertising its availability to the public, and that Scanderbeg participated in making business decisions concerning the charter flights and shared in their proceeds.

control of all funds that had been received from the charter flights' customers and would use that money to make direct payments to the substitute air carrier.[4]

That same day, Scanderbeg asked Air Italy to sub-charter one of its 757-200 aircraft to Sky King, so that the aircraft could be used to complete the charter flights the Sky King aircraft would no longer perform. Scanderbeg submitted to Air Italy an "ACMI (Aircraft, Crew, Maintenance Insurance) Contract" ("757 Contract"), which provided for the sub-charter to Sky King of an Air Italy 757-200 aircraft for operation of seven round-trip flights and one returning flight to JFK Airport between August 28, 2009 and September 9, 2009. The 757 Contract provided for payment to Air Italy in two installments: €355,000 was to be paid on August 24, 2009, and another €200,180 on August 28, 2009. The contract was executed by representatives of Air Italy, Sky King and Scanderbeg. On August 28, 2009, Air Italy, Sky King and Scanderbeg entered into a second ACMI contract ("767 Contract"), which substituted certain remaining flights provided for by the 757 Contract with provisions for operation of an Air Italy Boeing 767-300 aircraft on two ferry flights (without passengers) between Milan and Tirana, and JFK Airport and Milan, respectively, and one passenger flight from Tirana to JFK Airport via Shannon, Ireland. All flights were scheduled for September 9, 2009. Air Italy was to be paid €105,950 on August 31, 2009.

---

[4] DOT regulations require that customer payments be held in escrow until after the chartered flights are completed. 14 C.F.R. §§ 212.3, 212.8, 380.34. The payments must first be deposited in an escrow account held on behalf of the charterer pursuant to an agreement between the charterer, the carrier, and a designated bank. 14 C.F.R. § 380.34(b)(2). The agreement must provide for payment from the charterer's escrow account to the carrier prior to the completion of each charter flight, *id.* § 212.3(e), but no earlier than 60 days prior to the flight's scheduled departure, *id*. § 380.34(b)(2)(ii). However, payment may not be made *directly* to the air carrier; it must instead be made to an escrow account on behalf of the carrier. *Id*. § 212.8. The carrier's escrow bank may release the funds into the carrier's control only after the carrier certifies in writing to the bank that a flight has been completed. *Id*. Similarly, any funds remaining in the charterer's account may be released to the charterer no sooner than two days after the completion of the flight. *Id*. §380.34(ix). In this case, Aviation and Sky King informed DOT that the National City Bank of Waterford, Michigan would serve as their escrow bank.

3

The contracts were structured as sub-charter agreements between Sky King and Air Italy at the instigation, and for the benefit, of Scanderbeg and Aviation. Defendants designed the transaction so that Sky King would appear to remain as the air carrier in compliance with the prospectus filed with the DOT, even though Sky King did not participate in or benefit from the charter arrangements after the 757 Contract was signed by Air Italy.

Air Italy fulfilled all requirements of the 757 Contract that were not terminated by the 767 Contract, and all requirements of the 767 Contract. Air Italy received seven partial payments for its services under the 757 Contract and no payments for its services under the 767 Contract. All payments to Air Italy were made by Aviation, not Sky King, although Aviation was not a signatory to either written contract. The payments were made from an account at PNC Bank, a Pennsylvania Bank, rather than the Michigan bank Aviation and Sky King had identified to the DOT as their escrow bank. Aviation repeatedly assured Air Italy of its willingness and ability to make all payments under the contracts and assured Air Italy that it had sufficient available funds, including $300,000 in non-passenger funds, to cover the amounts due to Air Italy under the contracts. However, Aviation as well as Scanderbeg knew at the time the contracts were entered into that insufficient funds were available to pay Air Italy pursuant to their terms. Air Italy claims that Aviation and Scanderbeg are jointly and severally liable for $268,783.14 remaining due under the 757 and 767 Contracts, plus interest from September 1, 2009, and the costs of this lawsuit.

B.  *Bridgeman's Involvement in Negotiations Between Air Italy and Aviation*

Aviation argues that Bridgeman and the Alford law firm should be disqualified from representing Air Italy in this action by virtue of the witness-advocate rule, because Bridgeman was a key participant, and the sole representative of Air Italy, in communications

central to the dispute between Air Italy and Aviation. In particular, by sworn declaration, James Gallagher, president of Aviation, identifies at least three telephone conversations concerning the 757 Contract that took place in August 2009 in which he and Bridgeman were the sole participants. Decl. James Gallagher, Dec. 3, 2010, ECF. 46. In one call that took place on August 24, 2009, Gallagher told Bridgeman that Aviation held in escrow funds that were to be paid to Sky King for the charter flights Sky King was originally intended to operate. *Id*. ¶¶ 6-7. Gallagher informed Bridgeman that Sky King had directed Aviation to pay those funds directly to Air Italy on Sky King's behalf in order to fulfill Sky King's obligations under the 757 Contract. *Id*. Bridgeman requested that the money be paid directly into an Air Italy operating account prior to the completion of the flights, but Gallagher explained that DOT regulations required that the funds be held in escrow until after completion of the flights. *Id*. ¶¶ 7-8.

Gallagher asserts that during that same phone call, he suggested that Air Italy and Aviation enter into a contract replacing the 757 Contract, which would identify Air Italy as the carrier and Aviation as the charter operator and would allow Air Italy to receive money from Aviation both in escrow for the charter flights and outside of escrow as a security deposit to offset any potential future costs. *Id*. ¶ 9. In the last week of August 2009, Gallagher reiterated this offer on at least two more phone calls, which again involved only himself and Bridgeman. *Id*. ¶ 4.

In his own declaration, Bridgeman agrees that the August 24, 2009 telephone conversation with Gallagher took place, but he recalls the substance of the conversation differently. Decl. Lester M. Bridgeman ¶¶ 7, 9, Dec. 22, 2010, ECF No. 47. Specifically, he denies that Gallagher informed him that Sky King had directed Aviation to make payments on its

5

behalf to Air Italy, and he denies that Gallagher suggested that Air Italy and Aviation enter into a written contract. *Id*.

## DISCUSSION

A. *Legal Standard for a Motion to Disqualify*

"The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court." *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). I am guided by Rule 3.7 of the New York Rules of Professional Conduct, the "witness-advocate rule," which applies when a lawyer may be called as a witness. Rule 3.7(a) dictates that, absent certain exceptional factors, "[a] lawyer shall not act as advocate before a tribunal in which the lawyer is likely to be a witness on a significant issue of fact[.]" 22 N.Y. C.R.R. § 1200. Under Rule 3.7(b), "[a] lawyer may not act as advocate before a tribunal in a matter if . . . another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client[.]" *Id*.

While New York law governs the professional conduct of attorneys in this state, "[t]he authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). "[N]ot every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc.*, 409 F.3d at 132. Motions to disqualify counsel under the witness-advocate rule "'are subject to fairly strict scrutiny'" because they are susceptible to being abused for tactical purposes. *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)).

B.  *Disqualification of Bridgeman*

"[W]here an attorney is the 'sole representative for a party at numerous meetings and conversations negotiating the terms of an agreement' at issue in the litigation, disqualification is warranted." *Sea Tow Intern., Inc. v. Pontin*, No. 06-CV-3461 (SJF) (ETB), 2007 WL 4180679, at *4 (E.D.N.Y. Nov. 19, 2007) (quoting *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635, 2003 WL 1961636, at *7 (S.D.N.Y. Apr. 25, 2003)) (alterations omitted).  As discussed in the memorandum and order denying Aviation's motion to dismiss, Air Italy claims that it had a contractual relationship with Aviation even though there were no written contracts between the two companies.  It further claims that statements made by Aviation gave rise to liability under principles of promissory estoppels and fraud.  As a result, the content of the oral and written communications between the two companies in the summer of 2009, and the intent of the parties making those communications will be the factual centerpiece of this case.

The affidavits and other evidence submitted with the parties' moving papers place Bridgeman at the heart of critical events in the case.  Bridgeman acted as the sole spokesperson for Air Italy in significant communications with Gallagher about Aviation's obligations to Air Italy.  In order to succeed on its implied contract claims against Aviation, Air Italy will need to prove that Aviation's "words and conduct should reasonably be understood as evincing a contractual intention." *Air Italy S.p.A.*, 2010 WL 2925949, at *4 (memorandum order denying Aviation's motion to dismiss).  Aviation argues that the conversations between Bridgeman and Gallagher will show that Aviation evinced the opposite intent – *not* to be answerable to Air Italy for the amounts owed under the 757 and 767 Contracts.

According to Gallagher, he told Bridgeman during one of these conversations that Aviation had been instructed by Sky King to pay Air Italy on its behalf. If a jury were to believe that assertion, it could conclude that Aviation, even in making partial payments to Air Italy, showed no intent to be held liable for any of the outstanding amounts Air Italy seeks compensation for here. Furthermore, if a jury believed Gallagher's account of the telephone conversations with Bridgeman, it could conclude that Aviation made clear to Air Italy it would be contractually bound only under the terms allegedly offered to, and rejected by, Bridgeman during these conversations.

Bridgeman denies that Gallagher ever informed him of the arrangement with Sky King or proposed that Aviation and Air Italy enter into a written contract. As the sole Air Italy representative in the conversations at issue, his testimony may be necessary to rebut Gallagher's account. *See Gandler v. Nazarov*, No. 94 CIV. 2272 (CSH), 1994 WL 391665, *2 (S.D.N.Y. July 28, 1994) (disqualifying attorney who "was intimately involved in the negotiation and execution" of the contract at issue, where "[a]bsent his testimony, it will be impossible for the plaintiffs to explain or rebut defendant's testimony").

The Second Circuit has identified four risks that threaten to harm the integrity of the judicial process if an attorney is permitted to be both witness and advocate in a single proceeding: "(1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when she has to cross-examine her lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of advocate and witness both, the line between argument and evidence may be blurred, and the jury confused." *Murray*, 583 F.3d at 178. This final risk has been identified by

the Second Circuit as the "most important" concern when the advocate-witness rule is violated. *Ramey v. District 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 283 (2d Cir. 2004).

It is always difficult to predict what will happen in a future trial. As the Supreme Court put it in analogous circumstances, a district judge faced with a pretrial motion to disqualify counsel is asked to consider what might occur at trial, which in the pre-trial context can only be "seen through a glass, darkly." *Wheat v. United States*, 486 U.S. 153, 162 (1988). Nevertheless, it seems inevitable to me that there would be a blurring of the line between argument and fact that would impair the jury's fact-finding ability if Bridgeman served as trial counsel in this case. *See id.* at 164 (affirming disqualification of criminal defense attorney where district court perceived "a serious potential" for conflict of interest). He would be unable to call Gallagher's testimony into question without his argument including (or appearing to include) statements of fact. He could not challenge Gallagher's account of a conversation between them without creating the risk that the jury would treat his argument as an unsworn assertion of fact. The resulting confusion "could undermine the integrity of the judicial process." *Murray*, 583 F.3d at 178. Accordingly, Bridgeman is disqualified from serving as Air Italy's trial counsel.[5]

Although Bridgeman may not appear before the jury as a trial lawyer, he may continue to represent Air Italy in this case. *See id.* at 179 (Rule 3.7(a) does not apply to attorney likely to be called to testify at trial who "is a member of the trial team, but will not act as an advocate before the jury"); *Ramey*, 387 F.3d at 283 ("The advocate-witness rule applies, first and foremost, where the attorney representing the client before a jury seeks to serve as a fact witness

---

[5] Counsel for Air Italy began and ended the oral argument on Aviation's motion by agreeing to an order precluding Bridgeman from serving as counsel at trial. If similar concessions occur in the future, counsel are directed to let the Court know of them as soon as possible so the resources of the Court are not expended preparing to rule on motions (or parts of motions) that are not contested.

9

in that very proceeding." (emphasis omitted)). The concerns identified by the Second Circuit in *Murray*, 583 F.3d at 178, are not implicated if Bridgeman continues to serve an advocate for Air Italy in this matter as long as he does not appear as an advocate before a jury at trial.

C.      *Disqualification of Alford, Clausen & McDonald, LLC*

Aviation seeks an order disqualifying the Alford law firm by imputation. "In imputation cases (Rule 3.7(b)), the witness is not acting as trial counsel," and the concerns for the integrity of the judicial process "are therefore 'absent or, at least, greatly reduced.'" *Murray*, 583 F.3d at 178 (quoting *Ramey*, 378 F.3d at 283). Accordingly, "a law firm can be disqualified by imputation only if the movant proves by clear and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result." *Murray*, 583 F.3d at 178-79. Aviation has not satisfied either element.

Testimony is "prejudicial" only if it is "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Lamborn*, 873 F.2d at 531 (internal quotation marks omitted). Though Bridgeman's declaration is not as fulsome as it might be, it nevertheless indicates that his testimony will not be adverse to his client's interests. Aviation has not met its "burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial." *Id*. (internal quotation marks omitted).

Even if Bridgeman's testimony turns out to prejudice Air Italy, the integrity of the judicial system will not suffer if members of Bridgeman's law firm continue to represent Air Italy and serve as trial counsel. They will presumably seek to impeach their partner on their client's behalf. Air Italy might reasonably have chosen a separate firm to prosecute this case,

10

thereby avoiding that unsavory prospect, but I foresee no meaningful harm either to Aviation or to the integrity of the process if it comes to pass.

## CONCLUSION

For the reasons stated above, Bridgemen is disqualified from serving as trial counsel on behalf of Air Italy. To that extent only, the motion to disqualify Bridgeman is granted. The motion to disqualify the Alford law firm is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated:    January 11, 2011
          Brooklyn, New York