UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AIR ITALY S.p.A.,                                      Civil Action No: 1:10-cv-00020-JG-JMA

Plaintiff,

                                          Judge:     Hon. John Gleeson
vs.                                       Hearing:   March 2, 2012
                                          Time:      11:30 a.m.
AVIATION TECHNOLOGIES, INC. d/b/a/        Location:  Courtroom 6C South
PUBLICCHARTERS.COM                                   United States District Courthouse
                                                     225 Cadman Plaza East
                                                     Brooklyn, New York

Defendant.


# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AVIATION TECHNOLOGIES, INC. d/b/a PUBLICCHARTERS.COM'S MOTION FOR SUMMARY JUDGMENT


Lester M. Bridgeman
Zieman, Speegle, Jackson & Hoffman, LLC
Five Dauphin Street
Post Office Box 11
Mobile, Alabama 36601
Tel: (251) 694-1700
Fax: (251) 694-1998
E-mail: lbridgeman@ziemanspeegle.com

| I. | INTRODUCTION | 1 |
|---|---|---|
| II. | STATEMENT OF THE CASE | 1 |
| III. | ARGUMENT | 6 |
| | I. Defendant's Preemption Argument is Without Merit | 6 |
| | II. Each of Plaintiff's Claims Raises Triable Issues of Material Fact. Defendant has Presented No Basis for Grant of Summary Judgment | 7 |
| A. | Promissory Estoppel and Implied Contract | 7 |
| | 1. Promissory Estoppel | 9 |
| | 2. Implied Contract | 12 |
| | 3. Fraud | 17 |
| IV. | CONCLUSION | 21 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AIR ITALY S.p.A.,                                    Civil Action No: 1:10-cv-00020-JG-JMA

      Plaintiff,                                    PLAINTIFF AIR ITALY, S.p.A.'S
                                                     MEMORANDUM OF LAW IN
vs.                                                  OPPOSITION TO DEFENDANT'S
                                                     MOTION FOR SUMMARY JUDGMENT

AVIATION TECHNOLOGIES, INC. d/b/a/
PUBLICCHARTERS.COM

      Defendant.

## Introduction

The very nature of this case and the causes of action set out in the Second Amended Complaint suggest, even without parsing Defendant's moving papers, that this case is replete with triable issues of material fact.

## Statement of the Case

This case arises out of a contract entered into in early 2009 between Defendant Aviation Technologies, Inc. and Sky King, Inc., a former defendant in this case (now bankrupt), which had at that time operated as a direct air carrier based in California. The contract provided for the operation by Sky King on behalf of Aviation Technologies, Inc., a charter organizer, of forty round-trip charter flights originating at John F. Kennedy International Airport in New York, (JFK) to Pristina, Kosovo and Tirana, Albania. Pursuant to 14 CFR Part 380 they jointly filed, together with their escrow bank and bonding company, with the Special Authorities Division of the US Department of Transportation "DOT", a prospectus seeking DOT approval for the operation of those flights. Aviation Technologies there identified itself as "charterer" and Sky

King as "direct air carrier" for these flights to operate in the "period June 12-September 13, 2009".[1] The DOT approved.

A third participant in the Sky King-Aviation Technologies arrangement was Scanderbeg Air, a New York corporation, which was a "retailer" of charter tours in the New York area concentrating apparently on residents or former residents of Kosovo and Albania. Scanderbeg (also now bankrupt) actively participated with Aviation Technologies in soliciting passengers for the Aviation Technologies charters. It also appeared, at least by August 2009, as an "agent" for Sky King in matters related to the European end of operations.

Sky King's Boeing 767 aircraft operated flights in this charter program until approximately August 20 or 21, 2009 when that aircraft was repossessed by the owner. This was the second time in the course of those 2009 operations that Sky King's aircraft had been unable to perform the operation.[2]

Scanderbeg, apparently acting for Sky King, immediately contacted Air Italy and attempted to arrange for Air Italy to provide Sky King with a substitute aircraft. Air Italy agreed to enter into a contract to sub-charter its aircraft to Sky King, a so called ACMI (aircraft, crew, maintenance, insurance) contract for Air Italy's operation as a sub-charterer to Sky King of a 757 aircraft. Sky King and Air Italy executed an ACMI contract on August 22, 2009. After revisions to assure conformance with US law, a second, corrected, contract was executed between those same parties on August 22, 2009. (Ex. 2 to Plaintiff's Response to Defendant's Statement of

---

[1] 14 CFR §380.34(c) and 14 CFR Part 212.8 of the DOT Passenger Protection Regulations require essentially that all customer payments to a charterer must be held in escrow, initially in an escrow account of the charterer and ultimately in an escrow account of the carrier so that payment out of the carrier escrow account to the actual possession and control of the carrier may not be made until two days after completion of each charter flight. Part 212.8 of the pertinent regulations is explicit in requiring that the escrow bank maintain separate accounting for each charter flight or round-trip charter flight. The National City Bank of Waterford, Michigan was the escrow bank of both of the two parties to the Aviation Technologies-Sky King contract.

[2] See Ex. 1 to Plaintiff's Response to Defendant's Statement of Material Facts, Gallagher dep., pp. 40, 41.

Material Facts). Air Italy contracted to operate its aircraft as a part of the Sky King fleet as a "sub-charter" with the aircraft and crew operating under the call letters of Sky King; treated for US Government purposes such as Customs, immigration, FAA, etc. and by airports, domestic and foreign, as a Sky King aircraft. Sky King itself continued throughout the period of Air Italy's operations as the direct air carrier under the terms of its lease with Aviation Technologies, its filings with the DOT and its charter regulations.

On or after August 23, 2009, essentially all discussions and correspondence with Air Italy and its US counsel concerning payments for Air Italy's flights and the amount and timing of such payments, with regard to the overseas flights themselves were conducted with Mr. Gallagher of Aviation Technologies. Never was there any communication between Air Italy or its counsel and Sky King's president, Mr. Lukenbill, nor, contrary to normal procedure, were any payments ever made from Sky King's escrow bank account. Instead, all such payments were sent directly by Aviation Technologies from its private account in a Pennsylvania Bank. Gallagher, of Aviation Technologies, left Air Italy no doubt that he controlled payment to Air Italy. (Ex. 3 to Plaintiff's Response to Defendant's Statement of Material Facts, Mancuso decl.; Ex. 6 to Plaintiff's Response to Defendant's Statement of Material Facts, Bridgeman decl.; Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts; Ex. 9 to Plaintiff's Response to Defendant's Statement of Material Facts, Minerva decl.).

This was Air Italy's first venture in operation of a US-originating charter flight or series of flights and its Financial Director, Gabriella Minerva, was concerned about the fact that Air Italy's usual procedure requiring payment in advance of flights could not function under the DOT charter rules applicable to passenger funds. She did not know the individuals or companies involved and was concerned about Air Italy's receipt of payment; whether payment would be

3

timely, and to know as soon as possible whether, or when, payment had been made. These problems resulted in a flurry of email correspondence between, primarily, Ms. Minerva, and Gallagher, and between Ms. Minerva and Air Italy's US counsel, Bridgeman. These doubts were ultimately resolved in two ways: (1) Aviation Technologies and Bridgeman agreed that payments would be made into Bridgeman's law firm's trust account at his local bank, notice of receipt was sent to Air Italy by Bridgeman's law firm and the money was wired from that bank to Air Italy; and (2) the August 24, 2009 email sent by Gallagher to various individuals at Scanderbeg and Air Italy (but not to Air Italy's United States attorney) in which he expressed his eagerness to begin payment (Air Italy had operated its first flight on the previous day). In that email, Gallagher said, in pertinent part:

"We have available to send the full ACMI payment for the completed Flights, plus an additional $300,000.00 for future flights (All of these funds are not passenger funds and are available funds to place directly into Air Italy's operating account). The balance is funded from ticket sales and must go into escrow and can only be released after flight completion as this is the DOT rule. There is enough money to make the full payments per contract – it is just how and where they are made. We can fund you completely – but part of this will have to be in Escrow…."

"Take no worries as we are aware of our payment obligation and have been working all weekend off of the budgets from the ACMI contract."

"We appreciate that you will finish this program for us."

(Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts, Bates No. AI000311).

Statements made in the first sentence (including the parenthetical statement) were false.[3]

---

[3] See document AI000311 and AI300685 (Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts), and "Fraud" section of Argument below.

After Ms. Minerva's receipt of Gallagher's August 24, 2009 email above quoted, followed rapidly by Aviation Technologies' payment on August 25, 2009 for Air Italy's first trip…a payment fully consistent with the terms of the written contract…she agreed that the company, acting in reliance on Gallagher's statements followed by his actual payment, would continue to operate. *Id.*

On or about August 27, 2009, Air Italy agreed to a new contract for operation of a Boeing 767, which was executed on or about that date ("the 767 Contract") as again signed by Lukenbill, Scanderbeg, as agent for Sky King, and by Air Italy simply continuing the new contract, eliminated, in the 757 Contract, two 757 flights that Air Italy had contracted to operate after September 4, 2009 and substituted therefor a ferry flight of an Air Italy Boeing 767 300 aircraft from Milan, Italy to Tirana, Albania to pick up passengers; then Tirana to Pristina then return to JFK via Shannon, Ireland and ferry back to Italy.

Air Italy carried out all of its contractual obligations under the 757 contract, as amended, and under the 767 contract.

Aviation Technologies has since failed and refused to pay for any part of the services performed under the 767 contract and has also failed to pay completely for performance under the 757 contract leaving a total amount due to Air Italy as of September 9, 2009 excluding interest of $268,783. All amounts paid to Air Italy through Aviation Technologies' bank in Pennsylvania in accordance with the terms of the written contract as promised by Mr. Gallagher. The evidence now in the possession of the Plaintiff shows that Mr. Gallagher knew on August 24, 2009 that he did not have the money he promised Air Italy that he did have.

## Argument

**I.      Defendant's Preemption Argument is Without Merit.**

Defendant's preemption "defense", which appears, at best, to be a belated attack upon this Federal Court's subject matter jurisdiction, relies upon 49 U.S.C. § 41713 (b), the Airline Deregulation Act ("ADA"), which is a toothless statute in the context of this case.  This "defense" has no place in this proceeding.

The terms of the ADA are clear.  The statute simply says in pertinent part:

"(b) Preemption-

"(1) Except as provided in this subsection, a State, political subdivision of a State or political authority of at least two States may not enact or enforce a law, regulation or other provision having the force and effect of law related to that price, route or service of an air carrier that may provide air transportation under this subpart."

It is obvious that the sine qua non to invocation of this statute is the issue of the applicability in a judicial proceeding, of State or local legislation "related to a price, route or service of an air carrier that may provide air transportation…".

This case is a simple common law action; and no legislative enactment of any state or local jurisdiction relating to airline routes or services has any pertinence to this case.

Defendant has conveniently forgotten that requirement, although it is the essence of the statute.  In fact, one of the Supreme Court decisions upon which Defendant relies, *American Airlines v. Wolens 513 U.S. 219 (1995)* arose out of a breach of contract case.  In part IIB of that decision, the Supreme Court held that simple state contract cases are not within the scope of the ADA and it added:

"Responding to our colleagues' diverse opinions, dissenting in part, we add a final note. This case presents two issues that run all through the law. First, who decides (here, Courts or the DOT, the latter lacking contract dispute resolution resources for the past)?  On this question, all

6

agreed to this extent. None of the opinions in this case would foist on the DOT work Congress has neither instructed nor funded the department to do."

That holding of the Supreme Court applies, <u>a fortiori</u> in this case, where no State statute is involved and this Court is presented with a simple common law action requiring no technical expertise. See also the decision of the U.S. Court of Appeals of the 2nd Circuit in *Abdu-Brisson v. Delta Airlines 128 F 3rd 77 (1977),* particularly the penultimate paragraph  of that decision which said in part:

"To borrow the flight vernacular that the First Circuit used in *French v. Pan Am, Inc.,* *1869 F 2nd 1(1st Cir. 1989),* New York's laws have not yet been 'grounded'."

## II.      Each of Plaintiff's Claims Raises Triable Issues of Material Fact. Defendant has Presented No Basis for Grant of Summary Judgment.

Plaintiff will show here that there is, at least, no basis for a grant of Summary Judgment in Defendant's favor on either the implied contract or promissory estoppel claims.

The fraud claim stands on a different footing and will be separately discussed.

### A.      Promissory Estoppel and Implied Contract

Plaintiff will discuss in this section both implied contract and its claim based on promissory estoppel because of the related nature of the evidence applicable to both. As this Court pointed out in its 2010 decision"

"To state a claim for promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made and (3) injuries sustained in reliance on the promise.   See <u>Williams v. Eason</u>

854NYS2nd 477, 479 (2d department 2008); and see also Restatement (Second) of Contracts §
90."[4]

As to "implied contract" this Court noted:

"A contract implied in fact may result as an inference from the facts and circumstances of
the case although not formally stated in words...and is derived from the 'presumed' intention of
the parties as indicated by their conduct...nevertheless like an express contract, a contract
implied in fact requires mutual assent evincing the intention for the parties to be bound by
specific contractual terms. ...To determine the existence of a contract implied in fact, the focus
rests upon the parties' conduct. ...Where the facts are inconsistent with the finding that the
parties agreed to the specific terms of the contract to which they would be bound, no implied
contract may be found to exist." The ultimate criterion; i.e. the ultimate material issue of fact, is
the intent of the parties as determined by their statements and their conduct.

Plaintiff's evidence shows, primarily in the form of written (email) correspondence, the
absence of any basis for a grant of Defendant's Motion. If anything, it suggests action by the
Court pursuant to Rule 56(f).

### 1.    Promissory Estoppel

The facts underlying Plaintiff's claim for promissory estoppel are indisputable. Nothing
speaks to that more clearly than the Gallagher email to Air Italy sent on behalf of Aviation

---

[4] The Restatement section cited states:

"A promise which a promisor should reasonably expect to induce action or forbearance on the part of the
promissee...and which does induce such action or forbearance is binding if injustice can be avoided only by
enforcement of the promise...."

Technologies on August 24, 2009, the first work day after the 757 Contract was executed. (Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts, Bates No. AI000311).

Gallagher sent Air Italy a following email on the same day setting out his payment plans for the entire series of flights to be carried out under the 757 Contract. *Id.* at AI000307, 308.

Air Italy repeatedly stated its extreme concern whether it would in fact be paid, how, when it would receive notice of payment and, initially, why they should not be paid in advance. That concern was exacerbated by their lack of practical familiarity with U.S. charter rules. The above-quoted document sent August 24, 2009 by Gallagher promising payment to the end of the then agreed series of payment clearly conforming to the formulae of the written Sky King Contract, convinced Air Italy that it could rely upon the promises of Aviation Technologies followed the next day by actual payment. *Id.*[5]

The stated purpose of Gallagher in sending his "promissory" letters of August 24 and 25, 2009 was to cajole Air Italy into carrying out the remainder of the program. Completion of the program, although not completion of payment, would clearly be to Gallagher's advantage.

The correspondence from Air Italy in the period August 23, 2009 and following demonstrates Plaintiff's reliance on Gallagher's promises and acts. Reasonable reliance by Air Italy was apparently the facts as they developed in the days remaining to the charter series. Air Italy had been promised and, for a week more or less, and multiple trips they had been paid the expected amounts. That reliance was, ultimately, to its detriment to the tune of $268,783.14. There is no evidence here of any disclaimer by Aviation Technologies of legal liability for Air

---

[5] Plaintiffs were then unaware, however, of the ominous signs, not apparent to them, inherent in the proposal for substitution of the 767 aircraft which permitted the consolidation into a single flight of passengers returning to JFK from both Pristina and from Tirana. Consolidation was, of course, an "economy" measure for Gallagher and significantly, Gallagher sent no copy of document AI000311 to Air Italy's U.S. counsel nor did any word come to Air Italy's U.S. counsel about the 767 Contract until after that contract was signed. (Ex. 6 to Plaintiff's Response to Defendant's Statement of Material Facts, Bridgeman decl.).

Italy's reliance upon its promises…until the threat of litigation loomed on the horizon. On the contrary, Gallagher's emails encouraged reliance.

Reactions of Air Italy demonstrated by its officers and employees in its Financial Department also shows that its reliance was entirely upon Aviation Technologies and Gallagher. As far as Air Italy was concerned, Sky King had been replaced as the pay master by Gallagher. The continuing series of emails requesting payment and inquiring about the timing of future payments all went from Air Italy to Gallagher; and the communications from him beginning August 23, 2009 leave no question that Aviation Technologies had taken over the Sky King function, and Air Italy understood and relied on Gallagher's representations.

Defendant contends that because there "is an express contract covering the subject matter, there can be no promissory estoppel claim". However that statement is unduly broad and inapplicable here.

Defendant's reliance upon MBIA Insurance Corp. v. Royal Bank of Canada, 28 Misc. 3d 1225 A (NY Sup Court 2010) is unhelpful to it.

MBIA was an extremely complex case brought by the Plaintiff, an insurer of default swaps, against the Royal Bank of Canada, Europe and several related companies including RBC Markets Corporation and Royal Bank of Canada, Limited. The Eighth cause of action in MBIA, a promissory estoppel claim against RBCCCMC and RBC Europe, based on alleged misrepresentations they had made which, MBIA alleged, "they knew or should have known were false upon which MBIA allegedly relied, to its detriment, entering into the credit default swap contracts which it claimed it would not have entered into the contracts if it had known "the true set of facts". Slip opinion at 3. Defendants moved to dismiss pursuant to NYCPLR §

3211(a)(1). Neither of these two Defendants as to promissory estoppel was a party to any of the contracts as were the other Defendants.

The Court granted the Motion to Dismiss on the ground that Plaintiffs had "failed to allege a clear and unambiguous promise made by those two companies (RBCCMC and RBC Europe) on which Plaintiff could detrimentally have relied, "since all of the contractual promises came from the counter-party to the contract, RBC". (Slip op. p. 32).

The dicta added by the Court in that case stated:

"It is well settled that the existence of a valid and enforceable written contract governing a particular subject matter precludes quasi contract recovery on events arising out of the same subject matter. ... Thus it is only in cases where there is a bona fide dispute as to the existence of a contract that Plaintiff may plead alternative theories of recovery (contract and quasi contract)." (Slip op. 32).

Here, however, the written contract is not enforceable and has not been since 2010. Sky King's bankruptcy on March 25, 2010 and Scanderbeg's a few months later, in light of the "automatic stay" provisions of the bankruptcy law (11 U.S.C. § 362) eliminated both as Defendants, and the application of the written contract as an issue. Moreover, Gallagher's promises and actions relied on by Air Italy are entirely consistent with the terms of the now unenforceable agreement between Sky King and Air Italy and Gallagher's promises were carried out (up to the point where they were not carried out) in accord with the payment terms of the written contract.

Not only is there now no enforceable written contract before the Court. The evidence that is before the Court of Sky King's "double faults" in mishandling the Aviation Technologies' charter series, supported by Gallagher's deposition testimony (Ex. 1 to Plaintiff's Response to

11

Defendant's Statement of Material Facts), and his reported interest in a direct contract with Air Italy and his effective take-over of payment control from Sky King, is evidently that Aviation Technologies' President's intent to displace Sky King's payment functions under the contract with those of Aviation Technologies. *Id.* at pp. 59, 60.

The facts with respect to promissory estoppel enforce, in short, this Court's 2010 Memorandum opinion relying in part with respect to promissory estoppel upon Restatement (Second) of Contract § 90:

"(1) A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promissee… and which does induce such actions or forbearance is binding <u>if injustice can be avoided only by enforcement of the promise</u>."

The equity origins of the promissory estoppel remedy are applicable here where the only action to avoid injustice is to enforce payment by Aviation Technologies.

**(2) Implied Contract.**

The facts set out in the preceding portions of this memorandum and the documents otherwise provided by Plaintiff amply support Plaintiff's alternative, implied contract, claim.

First, there is no doubt that Aviation Technologies desperately needed the immediate services of Air Italy's aircraft beginning April 22 and 23, 2009. There is no doubt that Gallagher, for Aviation Technologies, made Air Italy an offer that they could not and did not refuse; i.e., not only informed them that he had more than adequate money to make payments to them on August 24, 2009 and told them on that day that they would be paid throughout the term of the 757 Contract and he sent them an email telling them precisely in what amounts they would be paid for each leg of each journey. Reasonably relying on his offer, they accepted. Gallagher's emails of August 24, 2009 told Air Italy that he wished to, and by his second email,

confirmed that he would pay throughout in the terms of the written agreement they had entered into with Sky King. Sky King was nowhere to be seen. Aviation Technologies had obviously replaced Sky King as the paying entity. *Id.* There was no doubt that there was a meeting of the minds. Gallagher wanted his flights to operate. Air Italy was willing to operate flights if they were paid to do them. Gallagher got what he wanted. Air Italy got what it wanted.

Defendant Aviation Technologies' argument number 1 does nothing to advance its position: "The parties did not intend to enter into an implied contract because it would violate DOT regulations".

Unfortunately for Aviation Technologies' theory, Air Italy had entered into the written contract with Sky King on the assumption that Sky King would make the required payments if Aviation Technologies replaced Sky King not by any choice of Air Italy but because Gallagher had ejected Sky King and left Air Italy with the choice of breaching its contract and possibly subjecting itself to suit in a foreign country or instead agreeing to Gallagher's replacement of Sky King as the paymaster.

Of course, Air Italy did not intend to enter into a "implied contract". "Implied contract" is an after-the-fact remedy rather than conscious advanced decision by the parties. The sworn deposition testimony of Gallagher of Aviation Technologies was that he had revealed the payment facts to the U.S. DOT in September 2009 and that the DOT simply suggested that he could have or should have arranged payment differently; i.e. by making payment to Sky King. *Id.* at 73.

That argument of Defendant is warped, in any case, because if any violation had been involved it was created initially without the knowledge or consent of Air Italy and Aviation Technologies' role as paymaster appeared only after execution of the 757 contract.

13

Defendant of course labors under the misapprehension that Air Italy was somehow violated the provisions of Part 380 and Part 212 of the DOT regulations. That, however, is clearly not true. "Direct air carrier" in terms of Part 380 was and remained Sky King. Air Italy's aircraft operated as a part of Sky King's fleet, using Sky King's flight numbers, and call letters. Sky King was liable to all U.S. and foreign authorities for taxes, airport fees, etc; on Air Italy's aircraft and, assuming the truthfulness of Gallagher's deposition testimony, the DOT suggesting that payment should have been made to Sky King was a short hand method of suggestion that that action should have been taken because Air Italy as a sub-charterer to Sky King should have been paid by Sky King out it escrow account.

And although Defendant insists that Air Italy "conceded" that it did not "obtain a Statement of Authorization" for any of the flights that it operated, its statement, at best, is immaterial. Air Italy was not required to obtain a statement of authorization because it then had authorization from the Department of Transportation in the form of an "exemption" to operate inter alia, between the United States and, inter alia, points in the European common aviation area which included both Kosovo and Albania. (Ex. 2 to Bridgeman decl.).


Air Italy in short, did not enter into any contract in violation of DOT requirements or regulations.

Aviation Technologies' argument "II": "Air Italy Entered Into two Express ACMI Contracts with Sky King and its Agent Scanderbeg Alone and therefore Air Italy had no intent to be bound by an implied contract".

This Aviation Technologies argument is merely repetitive of its first argument on implied contract and merits no further response other than to emphasize that no party enters into an

implied contract. Implied contract is simply a term for a judicial remedy; and the "implied contract" upon which Plaintiff relies here is not "an ACMI Contract". Plaintiff simply contends that by their words and actions, Aviation Technologies agreed that if Air Italy performed under the terms of the Sky King agreement then Aviation Technologies would as self appointed paymaster seeking to achieve his company's goals, pay in accordance with the terms of the written contract. Air Italy did its part and Aviation Technologies did not.

It is of course true that Air Italy did enter into the 767 contract with Sky King with the tacit understanding that Aviation Technologies would continue to be the paymaster. See Gallagher's later emails to Air Italy through early September 2009. (Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts).

Air Italy never asked Aviation Technologies to become a party to the Sky King agreement because that had been and then appeared to be, unnecessary, as well as illegal.

Defendant's sub-section "iii" of its implied contract argument requires no comment except for the correction of the errors.

The statement that "According to Mr. Bridgeman's emails, wet leasing to a U.S. carrier would have required DOT oversight, which Bridgeman did not want" is not correct. The correct statement, in essence, was that the inclusion of ACMI language would have reduced or eliminated the need to apply to the U.S. FAA (part of DOT) for its approval to "wet lease" to a U.S. carrier. This would have caused both delay and costs to Air Italy. No possible "DOT oversight" was involved.

The statement that "Air Italy admits that, on or about August 24, 2009, it investigated opening a <u>DOT approved escrow account</u>" is incorrect. As reported in his Declaration, Mr. Bridgeman considered opening an escrow account, for Air Italy, only for no purpose other than

to insure against premature payments to Air Italy by Gallagher; i.e. to insure that they remained in escrow until 48 hours after flight completion. This is, of course, different from Part 380 requirements for the opening of escrow accounts by direct air carriers and tour organizers. Here, the purpose was only to insure a reliable third party record to show that passenger money was secure until the appropriate time for payment directly to the air carrier. Defendant's paragraph at the bottom of page 12 of its argument obviously confused the distinction between the above proposal on the one hand, and on the other, the entry into a contract with Aviation Technologies for submission to the DOT pursuant to Part 380 with Air Italy as the direct air carrier. This would have obviously defeated the entire purpose of Gallagher's seeking immediate transportation for his passengers. The "process of payment to Air Italy" was never an aspect of Mr. Bridgeman's actual proposal rather than the one imagined in this paragraph of Defendant's Memorandum.

The statement on page 13 that "When Mr. Bridgeman wired the money to Air Italy, he listed Scanderbeg Air as the remitter" has been corrected in his Declaration.

The final paragraph on Defendant's page 13 dealing with the exchange of insurance coverage between Sky King and Air Italy is of course a standard procedure in aircraft leasing situations, and had absolutely nothing to do with intent or lack of intent to be bound by an implied contract.

The first paragraph on page 14, is of course probative of nothing material as is the following paragraph. That is of course that Air Italy's officers and employees sent multiple emails to Aviation Technologies regarding payments due, payments made, payments expected, etc. See attachments to Plaintiff's Responses.

In short, Air Italy's implied contract argument has added nothing to the debate. The fact remains that the evidence in the Court's possession and discussed in the promissory estoppel argument provides ample opportunity for the Court, in the alternative to promissory estoppel to accept Plaintiff's implied contract argument.

### (3) Fraud

As reported in Bridgeman's Declaration, Plaintiff invokes the provisions of Rule 56(d)(1-3) for the reasons set out below and requests the Court either to defer or deny the fraud aspect of Defendant's motion on the basis of evidence Plaintiff now has obtained, or to set a time for Defendant to complete its discovery or to issue any other order the Court might deem appropriate on the basis for Plaintiff's request here. Plaintiff admits the following in support of 56(d) request here:

Part 380 of DOT regulations 14 C.F.R. Part 380; and specifically §380.34 as applicable here requires the charter operator (Aviation Technologies) and the air carrier (Sky King, Inc.) to enter into an escrow agreement with a designated bank requiring, in essence and with immaterial exceptions, that all payments received from passengers by the charter organizer be paid into the escrow account of the organizer in the escrow bank which must remain there until not earlier than 60 days prior to the scheduled departure of the originating or returning flight to which the money applies upon certification of the departure date by the air carrier; except that in the case of a round-trip charter contract to be performed by a single carrier, carrier payment for the total round-trip charter flight may be paid to the carrier not earlier than 60 days prior to the scheduled day of departure. (The latter round-trip provision did not apply to the Sky King/Aviation Technologies contract.) After the charter price has been paid in full to the direct air carrier, the

escrow bank is required to pay funds from the account directly to hotels, sightseeing enterprise and other "providers" for whom payments have been made by the passengers.

The escrow bank is required to maintain a separate accounting for each charter group. With limited exceptions, the bank may not pay any funds from the account until 2 days after completion of the flight.

§ 212.8(a) contains duplicative requirements for passenger fund protection.

It is significant here that under both Part 380 and §212.8(a) a separate escrow accounting must be maintained by the escrow bank for each individual flight or round-trip charter flight:

The requirement for separate accounting of each individual flight or roundtrip flight is significant in the context of Plaintiff's fraud complaint here not only to the bank but to the charterer and carrier as well. For example, Aviation Technologies' record here shows that, even prior to advent of Air Italy into this charter series, there were instances in which Aviation Technologies was required to report to DOT on particular charter flights that required placement of passengers on scheduled airline flights. At any given time, particular flights or roundtrip flights do not sell well for one reason or another or perhaps oversell this may require cancellation of flights or changes in aircraft size or placing passengers on scheduled flights.

All of the above suggests that any reasonably competent organizer will maintain its own "running" records of the extent to which at any given time will inform the organizer of the number of passengers on any given flight and payments therefore so that he/it will be aware of the potential profitability of each flight, available aircraft seats, etc. with the help of the bank records, the organizer will have a clear picture on any given day of the money chargeable for any future flights.

14 C.F.R. Part 249 Preservation of Air Carrier Records applies expressly, among others, to public charter organizers such as Aviation Technologies, Inc. (14 C.F.R. § 249.1(b)) §249.2 "Preservation of Records by Charter Operators and Oversees Military Personnel Charter Operators" requires preservation by each charter operator such as Aviation Technologies of a broad variety of documents including but not limited to (d) all customer reservation records for each flight; all contracts with individual tour participants; and all bank statements and reconciliations for escrow bank accounts opened and maintained in accordance with DOT regulations.

§249.21 also expressly requires that each charter operator "shall retain the [described] records for six months after completion or cancellation of the flight or series of flights".

The original Complaint was filed in this case on January 5, 2010 and service was accepted by Aviation Technologies on January 7, 2010.

The series of charter flights that are pertinent to this case terminated on September 9, 2010. This means that Defendant was well aware of this case and it or its counsel should have been aware well before the lapse of six months, on March 9, 2010, that those records should have been preserved. However, in spite of requirements of Rule 26(a), Plaintiff's interrogatories and request for production, statements by James Gallagher and Aviation Technologies' counsel on the record at the Gallagher deposition in 2011 promising production of requested documents, Aviation Technologies has provided to Plaintiff no unredacted information that would reveal what Aviation Technologies knew on August 24, 2009 or later, on the basis of the records it necessarily had, and was required to maintain. Some documents were produced on January 13 in response to the emails sent by Air Italy's counsel on December 28, 2010 and some bank documents produced earlier, but nevertheless, no document produced by Defendant to date, with

19

a single partial exception, has revealed any specific information about the status of individual flights in terms of numbers of persons; accounting from the escrow bank in terms of copies of such statements revealing loads on individual flights at any given time. There is therefore nothing specific that Defendant has produced to date that provides any light on the issues raised by Plaintiff with respect to fraud although Aviation Technologies had or should have had statements that would reflect in full, for example, the basis, if any, for Gallagher's statements and promises in his August 24, 2009 email to Air Italy. (Ex. 7 to Plaintiff's Response to Defendant's Statement of Material Facts, Bates No. AI000311).

One document first produced on January 13, 2012 suggests on its face that Gallagher's email to Air Italy of August 24, 2009 contained a false statement that, as such, suggested a fraudulent intent.

"We have available to send the full ACMI payment for the completed flights, plus an additional $300,000.00 for future flights and all of these funds are not passenger funds and are available funds to place directly into Air Italy's operating account". *Id.*

Refutation of that statement appears in Aviation Technologies' document AI300685, a letter from Aviation Technologies to its escrow bank dated August 25, 2009. *Id.* at AI300685. Although that document suggests that Aviation Technologies had or was about to have $381,654.17 in its non-escrow account most of that money was committed to make payments for flights previously made by Sky King on August 12, 13, 14, 16, 18, 20 and 21, 2009. Only $143,663.56 remained for payment of a single flight identified as Sky King-082309-1, which had been completed by Air Italy's 757 aircraft but had not yet been paid for. The attached document appears to be the basis for Gallagher's claim. *Id.*

It is also clear that three days after his August 24, 2009 assurances, Air Italy had a request for use of a 304 seat 767 aircraft with the purpose of returning in that single aircraft passengers returning from both Pristina and from Tirana. That load, too big for one 757 is clearly more economical than two 757 flights; and this suggests that Gallagher knew by September 27, 2009, if not sooner, that he had a problem with the paucity of passengers; and more important that he had, and used the information, that he had, and used the information to make that decision.

Plaintiff is certainly entitled to see the documents that will either support its position or exculpate that of Aviation Technologies. The evidence thus far can reasonably support the conclusion that Gallagher's statement about the amount of money available was untruthful and that his promises for future payments were misleading.

Plaintiff suggests that the Court may wish to defer argument on this point, and perhaps a response from Defendant on this point unless and until documentary evidence that certainly had been and probably still is in the possession, custody or control of Aviation Technologies is produced. Once the Court is satisfied with that production, the fraud issue could be disposed of.

Plaintiff also suggests that the appropriate disposition should be at trial since its contention and its belief is that Summary Judgment is not warranted in Defendant's favor on any other issue now before the Court.

## Conclusion

For all of the reasons set out above, this Court should deny Plaintiff's Motion for Summary Judgment on all issues except that the Court may wish to defer its position on the fraud issue raised by Plaintiff pending production by Defendant Aviation Technologies of all records in its possession, custody or control as of, and since, August 24, 2009 that refer or relate

21

information respecting passenger loads, balances of passenger payments that were or should have been in escrow in respect to any flight to be operated on or after August 23, 2009; such documents to include bank records or copies of bank records received or retained by Aviation Technologies, Inc. and any and all other documents whether paper or electronic that contain, refer or relate to information available to such Aviation Technologies on August 23, 2009 and thereafter concerning passenger loads and passenger payment balances for flights operated or to be operated by Air Italy's 757 and/or 767 aircraft in the period September 23-29, 2009.

Respectfully submitted,

Lester M. Bridgeman
Attorney for Plaintiff Air Italy, S.p.A.
Of Counsel
Zieman, Speegle, Jackson & Hoffman, LLC
Post Office Box 11
Mobile, Alabama 36601
(251) 694-1700
(251) 694-1998 fax
lbridgeman@ziemanspeegle.com